A06A1807. BIJOU SALON & SPA, LLC et al. v. KENSINGTON ENTERPRISES, INC.
(643 SE2d 531)

ADAMS, Judge.

When Harvey and Victoria Adelsky sold their business to Kensington Enterprises, Inc., they signed covenants not to compete and not to solicit customers and employees. They later started a similar business nearby, took their customers, and encouraged the staff to

---

follow them. Kensington brought suit and alleged that the Adelskys were in violation of the agreements. It then sought and obtained an interlocutory injunction against the Adelskys and Bijou, who now appeal from that order.

The evidence presented at the hearing is not in great dispute. For four and one half years, the Adelskys had been the sole owners of V J & H, Inc., which owned and operated a hair and nail salon with the trade name "Salon Allure and Spa." On October 30, 2003, V J & H sold substantially all of the assets of the salon to Kensington for $110,000. As part of the consideration for the sale, Harvey Adelsky agreed to work for the new owners for five years.

At the same time, the Adelskys and V J & H entered into a "Non-competition and Non-Solicitation Agreement" with Kensington. These restrictive covenants were specifically referenced as part of the consideration for the asset-purchase agreement. Pursuant to the restrictive covenants, the Adelskys agreed not to compete with Salon Allure for a period of five years anywhere within a ten-mile radius, "either directly or indirectly, as an owner, partner, joint venturer, employee engaged in a managerial or supervisory capacity, independent contractor, consultant, distributor, or shareholder of a corporation. . . ." They also agreed for the same period not to solicit any business from any customer of Salon Allure, not to solicit any employees of Salon Allure, and not to divulge the client lists. In the agreement the parties also agreed that Kensington would suffer "irreparable loss and damage" in the event of a breach, and that "in addition to all remedies provided at law or in equity, the Purchaser shall be entitled to seek a temporary restraining order and a temporary and permanent injunction to prevent a breach of such covenants." A signed amendment was introduced into evidence which reduced the restricted area to a six-mile radius. But Salim Bhamla, the owner of Kensington, testified that he did not sign it and that his signature was forged.

Bhamla testified that an integral part of the business was the employee-customer relationships and that the reason Harvey Adelsky was asked to stay on was to encourage the staff to stay and work for him. Bhamla testified that the plan was working until December 24, 2004 when, one hour before closing time, Harvey Adelsky announced that he was retiring from hair cutting and walked out. Victoria Adelsky, who had continued to work for the new owner as a manager, never returned after that day as well. On the next business day, five other staff members quit, leaving only one hairdresser and one esthetician. None of the customers showed up thereafter for their appointments.

Within about two weeks, Bhamla discovered another salon and spa — approximately five miles from Salon Allure — named Bijou

Salon & Spa, where he found the Adelskys at work. Bhamla also obtained information from the Secretary of State's office showing that Bijou Salon & Spa, LLC, with a principal place of business at the same address as the Adelskys' residence, had been incorporated on January 22, 2004, just three months after the sale of Salon Allure. Bijou is owned by the Adelskys and Julianna Carter, one of the hairdressers who left Salon Allure for Bijou.

Another hairdresser who left testified that six or eight weeks before leaving Salon Allure, Harvey Adelsky took her outside and asked, "hypothetically speaking," if he were going to "do something with a new salon," would she be interested. Harvey and Victoria told her that the option to go with them was a one-time opportunity. For the next several weeks, the staff talked openly about how the new salon would be opening and the staff would be going there. Only Bhamla was not a part of those conversations. The evidence also established that Harvey and Victoria intended to own the new salon, that they had been planning to open it for several months, and that they had been working on the project for almost a year. Harvey Adelsky essentially admitted most of these facts. Carter was aware of the Adelskys' restrictive covenants.

The same hairdresser testified that prior to the mass departure, she heard the Adelskys tell Salon Allure clients "numerous times" that there was going to be a new salon. And near the end, customers were told that their next appointment would be at the new location. Harvey Adelsky admitted as much. Carter, too, admitted that she told her Bijou customers of the change. Prior to its opening, the staff learned where the new salon was located. There was evidence that Victoria Adelsky copied the Salon Allure client record cards into her computer and took the computer home. The services offered at Bijou were exactly the same as at Salon Allure, and many of the same customers were served there. Following the mass exodus, the gross revenue of Salon Allure fell from $21,000 a month to $4,000 a month. There was also evidence that Victoria said that Harvey had restructured their assets so that if Bhamla brought suit, he would never collect anything.

On March 28, 2005, Kensington brought suit and alleged breach of contract, fraud, unfair competition, and tortious interference with business relations against the Adelskys and V J & H. Kensington also alleged that Bijou engaged in unfair competition and tortious interference with business and contractual relations. On November 3, 2005 (following the hearing on the interlocutory injunction held on June 3), the trial court entered an order in which it found that Bijou was a competing business, operating within the restricted area. The court therefore restrained and enjoined the Adelskys from breaching

the agreements, and enjoined Bijou from employing Harvey and Victoria Adelsky in violation of the agreements.

The appellants contend that Kensington failed to make the requisite showing to obtain injunctive relief and that the order fails to preserve the status quo.[1] An interlocutory injunction is designed to preserve the status quo pending a final adjudication of the case, and in so doing, the "trial court must balance the conveniences of the parties pending the final adjudication, with consideration being given to whether greater harm might come from granting the injunction or denying it." (Footnote omitted.) *Univ. Health Svcs. v. Long*, 274 Ga. 829, 829-830 (561 SE2d 77) (2002). The decision whether to grant or deny interlocutory injunctive relief is in the discretion of the trial court, and we will not disturb the trial court's order in the absence of a manifest abuse of that discretion. *Bernocchi v. Forcucci*, 279 Ga. 460, 461 (1) (614 SE2d 775) (2005); *Kennedy v. W. M. Sheppard Lumber Co.*, 261 Ga. 145, 146 (1) (401 SE2d 515) (1991). "Although a trial court has broad discretion in deciding whether to grant or deny an interlocutory injunction, the trial court's discretion can be ultimately circumscribed by the applicable rules of law." (Footnote omitted.) *Long*, 274 Ga. at 829-830.

Here the evidence strongly suggests that the Adelskys are in breach of several of the restrictive covenants, which were specifically designed to protect Kensington from the acts taken by the Adelskys.[2] The evidence supports the conclusion that Bijou, owned and operated by the Adelskys and Carter, was established within even the six-mile area found in the disputed amendment to the restrictive covenants. The merits of the claims may be considered when ruling on injunctive relief:

> Although the merits of the case are not controlling, they nevertheless are proper criteria for the trial court to consider in balancing the equities. If the trial court determines that the law and facts are so adverse to a plaintiff's position that a final order in his favor is unlikely, it may be justified in denying the temporary injunction because of the inconvenience and harm to the defendant if the injunction were granted. (Cits.) Thus, in determining whether the equities favor one party or the other, a trial court *may* look to the final hearing and contemplate the results. (Cits.)

---

[1] The appellants do not argue that the covenants, as written, are unenforceable.

[2] Cross-examination showed that five people who left employment in December 2004 were independent contractors, not employees, and the covenants only restrict solicitation of "employees."

*R. D. Brown Contractors v. Bd. of Ed. of Columbia County*, 280 Ga. 210, 212 (626 SE2d 471) (2006). The merits of this case favor the grant of injunctive relief.

The evidence also shows that the restrictive covenants were to run for five years; that Kensington was being damaged every month by the breach; and that at the time of the court's order approximately three years remained on the duration of the covenants. In addition, the evidence shows that the Adelskys intentionally disregarded their covenants in almost every way, that their new business partner, Carter, was aware of the covenants, and that the three individuals were the sole owners of Bijou.

" 'Injunctive relief has repeatedly been found appropriate in cases where covenants such as this have been found to be enforceable.' " (Footnote omitted.) *Poe & Brown of Ga. v. Gill*, 268 Ga. 749, 750 (492 SE2d 864) (1997) (trial court abused its discretion by failing to grant injunctive relief when plaintiff could suffer longstanding harm to its business as a result of defendant's breach of a restrictive covenant). Because evidence was presented on both sides of the issue, we conclude that the trial court did not abuse its discretion in finding that the equities weighed in favor of Kensington and that the status quo of not having competition by the Adelskys within the restricted area was preserved by the order.

Bijou contends that the injunction was inappropriate against it because neither Bijou nor Carter was a party to the restrictive covenants. But Bijou was a proper party to the suit given that it was alleged, and there was evidence, that it maliciously helped to bring about the Adelskys' breach of their restrictive covenants.

> In all cases, a person who maliciously procures an injury to be done to another, whether an actionable wrong or a breach of contract, is a joint wrongdoer and may be subject to an action either alone or jointly with the person who actually committed the injury.

OCGA § 51-12-30. Evidence was presented that the Adelskys, acting on behalf of Bijou, took customer data, solicited clients of Salon Allure, and entered into competition with Kensington within the restricted area, all with knowledge of the restrictive covenants. Even Carter, the third owner of Bijou, had knowledge of the restrictive covenants.

And a third party may be subject to injunctive relief in such a case where there is evidence that it maliciously aided and abetted the breach of restrictive covenants with knowledge thereof. See, e.g., *Bennett v. Kimsey*, 218 Ga. 470, 475 (4) (128 SE2d 506) (1962);

*Kirshbaum v. Jones*, 206 Ga. 192 (56 SE2d 484) (1949);[3] *Nat. Linen Svc. Corp. v. Clower*, 179 Ga. 136, 146-147 (6) (175 SE 460) (1934). See also *Purcell v. Joyner*, 231 Ga. 85, 88 (3) (200 SE2d 363) (1973) (implying that claim can be made for actively inducing, conspiring with, or aiding and abetting a person to breach a restrictive covenant). Here there was evidence that the three owners of Bijou, which had been formed long before the mass exodus, acted together and with malice and knowledge of the restrictive covenants in causing the breach of the restrictive covenants. Compare, e.g., *Spalding v. Southeastern Personnel of Atlanta*, 222 Ga. 339, 344 (2) (149 SE2d 794) (1966) (failure to allege that corporate defendant engaged in malicious tortious conduct).

Also, the Adelskys have not argued that the restrictive covenants are not enforceable. And, one of the provisions of the agreement is that in the event of a breach, "in addition to all remedies provided at law or in equity, the Purchaser shall be entitled to seek a temporary restraining order and a temporary and permanent injunction to prevent a breach of such covenants." Thus, the parties agreed that injunctive relief was proper.

The appellants also contend that the court erred because the order destroys Bijou's business and Carter's interest in it. Although Carter testified that she would go bankrupt if the injunction were issued, there is no evidence in the record that Bijou was incapable of continuing its business outside of the restricted area or that Carter was incapable of earning a living at Bijou without the involvement of the Adelskys. Moreover, this information was simply some of the factual information considered by the court in balancing the equities. We find no error.

*Judgment affirmed. Blackburn, P. J., and Mikell, J., concur.*

DECIDED MARCH 5, 2007.

*Brock Clay, Stephen A. Yaklin, Joseph B. Alonso*, for appellants.
*Dyer & Rusbridge, Samuel J. Rusbridge, Jordan J. Hendrick*, for appellee.

---

[3] Disapproved on separate grounds, *Fuller v. Kolb*, 238 Ga. 602, 604 (234 SE2d 517) (1977). See also *W. R. Grace & Co. v. Mouyal*, 262 Ga. 464, 467, n. 3 (422 SE2d 529) (1992) (disapproval of holding in *Kirshbaum* limited to facts in *Fuller*).