## A09A2006. PITTMAN v. COOSA MEDICAL GROUP, P.C.
(685 SE2d 753)

BERNES, Judge.

This appeal involves a dispute between Dr. H. Harris Pittman, a prominent neurosurgeon, and Coosa Medical Group, P.C. ("CMG"), the practice he helped found. After Dr. Pittman left CMG to work for another employer, CMG sued Dr. Pittman seeking to enjoin him from violating the noncompetition provisions of his employment agreement with CMG. The trial court granted CMG's request for a temporary injunction. On appeal, Dr. Pittman claims that the trial court erred in granting injunctive relief because (i) CMG had no legitimate business interest in enforcing the restrictive covenants, (ii) CMG had released Dr. Pittman from the restrictive covenants, and (iii) CMG had consented and requested that Dr. Pittman practice neurosurgery in violation of the restrictive covenants. For the reasons set forth below, we find these arguments to be without merit and affirm.

> As a general rule, a trial court has broad discretion in deciding whether to grant or deny an interlocutory injunction, and this Court will not disturb the trial court's decision absent manifest abuse of discretion. Further, where the trial court, in ruling on an interlocutory injunction, makes findings of fact based upon conflicting evidence, this [C]ourt will not disturb the ruling as an abuse of discretion unless the denial or granting of the injunction was based on an erroneous interpretation of the law.

(Citations and punctuation omitted.) *Westpark Walk Owners v. Stewart Holdings*, 288 Ga. App. 633, 635 (655 SE2d 254) (2007). See OCGA § 9-5-8.

> An interlocutory injunction is designed to preserve the status quo pending a final adjudication of the case, and in so doing, the trial court must balance the conveniences of the parties pending the final adjudication, with consideration being given to whether greater harm might come from granting the injunction or denying it.

(Citation and punctuation omitted.) *Bijou Salon & Spa v. Kensington Enterprises*, 283 Ga. App. 857, 860 (643 SE2d 531) (2007). Although not controlling, the trial court may consider the merits in balancing the equities. Id. "Because evidence was presented on both sides of the issue, we conclude that the trial court did not abuse its discretion in finding that the equities weighed in favor of [CMG] and

that the status quo of not having competition by [Dr. Pittman] within the restricted area was preserved by the order." Id. at 861.

The evidence adduced at the hearing shows that in 1993 a group of physicians including Dr. Pittman left the Harbin Clinic in Rome to form a practice, which later became CMG, based on "the rapid and comprehensive assessment of neurologic[al] care for the patient whether medical or surgical." In 1999, CMG began requiring its physicians to enter into employment contracts containing restrictive covenants because several doctors had left CMG and set up competing practices in the Rome area. Consistent with this policy, Dr. Pittman executed an employment agreement with CMG in which he agreed that if his employment with CMG was terminated,

> then for a period of one (1) year from and after the effective date of termination of [his] employment with [CMG], [he] shall not engage in the practice of medicine in [the professional medical specialty of neurosurgery] within a thirty (30) mile radius of [CMG's] principal office [in Rome].

As part of the agreement, Dr. Pittman acknowledged that irreparable loss and damage would be suffered by CMG if he breached the covenant, and that CMG would be entitled to injunctive relief to prevent a breach.

By a letter dated December 10, 2008, Dr. Pittman informed CMG of his intent to join Redmond Neurosurgery, LLC on January 1, 2009. CMG responded on December 12, 2008, with a letter referencing, among other things, Dr. Pittman's restrictive covenant obligations under his employment contract. On January 1, 2009, Dr. Pittman began working for Redmond as a neurosurgeon at a location approximately five miles from his offices at CMG. CMG brought its complaint for temporary and permanent injunctive relief approximately a month thereafter.

1. Pittman claims that the trial court erred in granting injunctive relief because there was no evidence that CMG had any legitimate business interest in enforcing the restrictive covenant. More specifically, Pittman argues that CMG would not benefit from the covenant not to compete in this case because Pittman practices neurosurgery and CMG practices neurology and the two specialties are complementary and not competitive. We disagree that CMG had no legitimate business interest in enforcing the covenant.

"[N]on-competition clauses in physicians' employment contracts . . . [l]ike such clauses in other employment contracts, if they are sufficiently limited and are reasonable, considering the interest to be protected and the effects on both parties to the contract, . . . will be upheld." *Pittman v. Harbin Clinic Professional Assn.*, 210 Ga.

App. 767, 768 (437 SE2d 619) (1993).[1] The reasonableness of the restrictions is a question of law. *Broome v. Ginsberg*, 159 Ga. App. 202, 203 (2) (283 SE2d 1) (1980). In this context, we have previously stated that

> [w]hen the contract involves the practice of a profession, it will be held void if it needlessly oppresses one of the parties without affording any corresponding protection to the other. In particular, it should not so operate as to cause one party to abstain from practicing his profession at a time or place when so doing would not benefit the other contracting party.

(Citations omitted.) Id. See, e.g., *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377-378 (1) (297 SE2d 473) (1982) (restrictive covenant was unreasonable because it overprotected the legitimate interests of the employer while unreasonably affecting the employee). As this principle was applied in *Broome*, a professional corporation which had "ceased to be such by operation of law" six months following the death of its professionally licensed shareholder could not enforce the agreement of its employee dentist to not compete with the corporation. *Broome*, 159 Ga. App. at 203 (1), (3). The underlying facts of this case are fundamentally different.

The evidence shows that the practices of neurosurgeons and neurologists "overlap on the front end" because the specialties see similar patients. From its founding until Dr. Pittman's departure, CMG's physicians included both neurologists and neurosurgeons. CMG's business model was based on an integration of the two specialties and the resulting increase in the efficiency of patient care.

After Dr. Pittman left CMG, CMG was left without a neurosurgeon. Nevertheless, as the trial court found, the remaining doctors were committed to continuing the business. According to CMG's president, Dr. Naguszewski, "our restrictive covenant needs to be honored[;] otherwise we will be severely damaged even in trying to rebuild." One component of the rebuilding process was attracting another neurosurgeon to CMG's practice. A second component was reassuring referring physicians that CMG was committed to its business model. As an example of how Dr. Pittman's refusal to comply with the restrictive covenant impaired this process, Dr.

---

[1] On appeal, Dr. Pittman does not contend that the restrictive covenants are unreasonable under the traditional three-part test of "duration, territorial coverage, and scope of activity." *Allen v. Hub Cap Heaven*, 225 Ga. App. 533, 538 (5) (484 SE2d 259) (1997). The trial court found the covenants at issue to be reasonable under this test and then considered at length Dr. Pittman's argument that he was not in competition with CMG.

Naguszewski explained that "when a physician leaves a group and sets up shop across town," as opposed to leaving the community, "all sorts of questions get raised," and that the questions associated with Dr. Pittman leaving CMG interfered with the reputation of CMG's remaining physicians. Dr. Naguszewski also testified that he was trying to recruit a neurosurgeon to join CMG and to enlist Floyd Medical Center to assist in that endeavor, that CMG had extensive experience in recruiting physicians, and that the presence of competing physicians has a "direct relevance" on the process. Dr. Pittman testified that in his present position with Redmond he had plans to recruit additional neurosurgeons and that he anticipated beginning the process before the end of the year. Thus, unlike in *Broome*, the evidence demonstrates that the enforcement of the agreement in this case would benefit CMG. The trial court did not err in rejecting Dr. Pittman's argument that CMG had no legitimate business interest in enforcing the agreement.

2. Dr. Pittman contends that the trial court erred in granting injunctive relief because the undisputed evidence showed that CMG expressly released Dr. Pittman from the restrictive covenants. We disagree.

The evidence shows that in the latter part of 2006, Dr. Pittman proposed establishing an ambulatory service center, an entity which allows a single specialty practice to do minor surgeries on an outpatient basis. According to Dr. Naguszewski, CMG discussed "allow[ing] Dr. Pittman to go into his own single specialty group provided that we could restructure the restrictive covenant to be a management contract with [CMG] and a sublease with [CMG] so that all of our ongoing commitments would be continued."

The minutes of CMG's August 21, 2008 board meeting reflect CMG's agreement to "allow Dr. Pittman to separate into Rome Neurospinal Center, P.C.," but that "a final agreement will be made" after Dr. Pittman had an opportunity to review a lease and management agreement. Following the board meeting, Dr. Pittman asked Dr. Naguszewski for a letter reflecting that he had been released from his employment contract with CMG. The trial court expressly rejected as unbelievable Dr. Pittman's testimony that he informed Dr. Naguszewski that he needed a written release because he was initiating talks with Redmond.

CMG delivered to Dr. Pittman a letter dated September 10, 2008, signed by Dr. Naguszewski in his capacity as CMG's president, in which CMG confirmed the decision of its board to allow Dr. Pittman to move his practice to Rome NeuroSpinal. According to the letter, Dr. Pittman's release from the restrictive covenants in his employment agreement was subject to the condition that Rome NeuroSpinal sublease office space from CMG for seven years and

enter into a billings and collection contract. The letter further provided that the sublease and the billings and collection contract were to be "structure[d] . . . to reflect our present and on-going commitments to each other."

Beginning on October 1, 2008, Dr. Pittman began billing his professional services through Rome NeuroSpinal. Rome NeuroSpinal reimbursed CMG for overhead expenses from October 1, 2008 through the end of the year. CMG also provided collection services for Rome NeuroSpinal for a fee. However, no written sublease or management agreement was ever executed by the parties, and according to Dr. Naguszewski, "there was no finalized deal."

"It is well settled that an agreement between two parties will occur only when the minds of the parties meet at the same time, upon the same subject matter, and in the same sense." (Citation and punctuation omitted.) *West v. Southern States Cooperative*, 275 Ga. App. 777, 778 (622 SE2d 12) (2005). As there was at least some evidence that CMG and Dr. Pittman never agreed to the final terms of a release from the restrictive covenants, Dr. Pittman's claim that the trial court abused its discretion in granting injunctive relief to CMG in the face of an express release is without merit. See *Covington v. D.L. Pimper Group*, 248 Ga. App. 265, 267 (546 SE2d 37) (2001) (if the trial court makes findings of fact based upon conflicting evidence in ruling on an interlocutory injunction, the ruling will not be disturbed as an abuse of discretion absent an error in interpreting the law).

Although Dr. Pittman complains that the trial court did not explicitly rule on its argument that CMG released Dr. Pittman from the restrictive covenants, the trial court's finding as to a lack of a release is inherent in the order. For example, in its findings of fact the trial court expressly stated that at the August board meeting, "[n]o final agreement was reached," that Dr. Pittman's representations to the board concerning the ambulatory surgery center "were the only reason [CMG] was considering such a release," and the order emphasizes in bold face that portion of CMG's letter providing that the structure of the sublease, billings and collection contract was "to reflect our present and on-going commitments to each other."

Dr. Pittman further contends that "because CMG failed to prepare sublease and management agreements acceptable to it within a reasonable amount of time" that the effect of the trial court's holding is to allow CMG to rescind its release. However, inasmuch as we conclude that the trial court found that CMG did not release Dr. Pittman from the restrictive covenants, we need not consider this issue, since CMG could not rescind an agreement it never made.

3. Lastly, Dr. Pittman argues that because CMG consented and requested that he practice neurosurgery in violation of the restrictive covenants, the trial court erred in granting injunctive relief to CMG. We disagree.

Dr. Naguszewski testified that after Dr. Pittman joined Redmond, he referred two of Dr. Pittman's former patients directly to Dr. Pittman, and that he referred ten other patients to Redmond. According to Dr. Pittman, he performed neurosurgery on one patient referred to his practice by CMG. The law generally provides "that to which a person assents is not in law an injury." *King v. Masson*, 148 Ga. App. 229, 230 (1) (A) (251 SE2d 107) (1978) ("[v]olenti non fit injuria"). Dr. Pittman argues that in light of the referrals CMG consented to and requested that he violate the restrictive covenants.

Under the circumstances, including the correspondence from CMG to Dr. Pittman before his departure as well as the filing of this lawsuit shortly thereafter, CMG made it clear to Dr. Pittman that it did not consent to Dr. Pittman's violation of the terms of the restrictive covenants. Dr. Pittman nevertheless made a choice to continue practicing neurosurgery within the restricted area even if this breached his contractual obligations to CMG. CMG's physicians might have chosen not to refer patients to Redmond or Dr. Pittman. However, as expressed by Dr. Naguszewski, CMG "patient's care supercedes any of this [contractual dispute]," and Dr. Pittman was "going to render the best medical decision" available in the community. The evidence supports the conclusion that CMG's physicians made referrals based on their independent medical judgment and in recognition of the services that were actually available to their patients. The trial court was not required to conclude that CMG had thereby consented to Dr. Pittman's breach of contract. "The trial judge [has] a wide discretion in 'balancing the equities' in a case such as this. . . . There being evidence to support him, no reversal will be granted thereon." *Central of Ga. R. Co. v. City of Metter*, 222 Ga. 74, 75 (2) (148 SE2d 661) (1966).[2]

*Judgment affirmed. Smith, P. J., and Phipps, J., concur.*

DECIDED SEPTEMBER 30, 2009 —
RECONSIDERATION DENIED OCTOBER 20, 2009.

*Kitchens, Kelley & Gaynes, Stephen V. Kern*, for appellant.

---

[2] In light of this decision, Dr. Pittman's motion to expedite this appeal is moot.

*Smith, Shaw & Maddox, Virginia B. Harman, Thomas H. Manning*, for appellee.