## A09A2287. AMERICAN CONTROL SYSTEMS, INC. v. BOYCE.
(694 SE2d 141)

DOYLE, Judge.

American Control Systems, Inc. ("ACS"), sued its former shareholder and employee, Andrew Boyce, for breach of the noncompetition, nonsolicitation, and nondisclosure covenants in his employment contract. ACS appeals the trial court's order granting Boyce's motion for summary judgment, arguing that there remain genuine issues of material fact for the jury, that the trial court improperly

---

[21] (Punctuation omitted.) *Beasley v. A Better Gas Co.*, 269 Ga. App. 426, 428 (1) (604 SE2d 202) (2004).

reviewed the restrictive covenants under the standard of strict scrutiny, and that the trial court erred in finding that the noncompetition and nonsolicitation covenants were not enforceable. Because they were ancillary to the sale of a business, we agree with ACS that the restrictive covenants contained in the employment agreement were not subject to strict scrutiny. Accordingly, we reverse the grant of summary judgment to Boyce on ACS's claim that he breached the covenant not to compete. Nevertheless, notwithstanding that the trial court applied the improper level of scrutiny in determining the reasonableness of the nonsolicitation covenant, Boyce established that there was no genuine issue of material fact as to ACS's contention that he improperly solicited the business of two ACS customers, and we affirm the grant of summary judgment to Boyce on this claim.

> To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and that the undisputed facts warrant judgment as a matter of law. A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. We review a ruling on a motion for summary judgment de novo, viewing the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the nonmovant.[1]

So viewed, the record shows that Boyce, Kent Bernard, and Ty Howard owned and operated ACS, a computer services company, from 1995 to 2001. In 2001, Barnes Family Holdings, LLC, obtained a 51 percent interest in ACS by purchasing shares from Boyce and Bernard, as well as stock issued by ACS.[2] Following the transaction, Boyce and Bernard each retained a 24.5 percent interest in the company.

On the same date as the stock purchase agreement, Boyce and ACS entered into an employment agreement pursuant to which Boyce agreed to serve as vice president and secretary of ACS. Bernard and George Barnes also entered into employment agreements with ACS, with Barnes agreeing to serve as ACS's chief executive officer. The delivery of the employment agreements, including Boyce's employ-

---

[1] (Punctuation and footnotes omitted.) *Community Newspaper Holdings v. King*, 299 Ga. App. 267, 268 (682 SE2d 346) (2009).

[2] It appears that Ty Howard was no longer a shareholder of ACS at the time of the transaction, but Bernard and Boyce each owned half of the company.

ment agreement, was a condition precedent to the holding company's obligation to consummate the stock purchase. Boyce's employment agreement contained noncompetition,[3] nonsolicitation,[4] and nondisclosure covenants.[5]

Boyce resigned as an employee and vice president of ACS on January 16, 2006, and received $9,800 in exchange for his stock in the company.[6] Boyce began working for his wife's information technology company, Prestige Computer Solutions, shortly thereafter. At the time of Boyce's resignation, ACS's clients included the law firms of Westmoreland, Patterson, Mosely & Hinton, LLP, and Stone & Chapman, P.C., both of which were located within 100 miles of Macon.

According to Barnes, Eileen Shannon, a representative of Westmoreland, called him within two hours of Boyce's resignation to inform him that Westmoreland was cancelling its contract with ACS. Shannon also admitted to Barnes that Westmoreland was hiring Boyce to provide its computer services. According to Shannon, Westmoreland contracted with Boyce to provide computer server maintenance and support beginning February 1, 2006. Stone entered into a service agreement with Prestige in the second quarter of 2006.

ACS sued Boyce claiming that he breached the employment agreement through actions including his employment by an ACS competitor, the solicitation of ACS customers, and in revealing and using ACS's confidential business information and trade secrets. The trial court subsequently granted Boyce's motion for summary judgment.

---

[3] The noncompetition provision required that
at all times during the Term of this Agreement and for a period of one (1) year after termination of this Agreement, [Boyce] will not directly, or indirectly through [any person or entity with or in which Boyce is a partner, officer, director, owner or creditor] be connected with or concerned in any business enterprise or employment which shall be in competition with the business of [ACS] (specifically including ownership, management, advisory, sales, administrative or control of any business enterprise that is active in the business of [ACS]) in [a 100 mile radius of Macon, Georgia].

[4] The employment agreement also included a nonsolicitation covenant with respect to ACS customers with which Boyce "had contact" during the two-year period preceding the agreement's termination. Boyce promised that for a one-year period following termination of the agreement, he would not "(i) induce any customers of [ACS] to patronize any similar business which competes with [ACS], or (ii) solicit, request or advise any customers of [ACS] to withdraw, curtail or cancel such customer's business with [ACS]."

[5] Boyce promised that during the term of the agreement, and for a one-year period thereafter, he would not "disclose to any person, firm, corporation, association or other entity not employed by or affiliated with [ACS], or make use of any confidential business information or trade secrets of ACS."

[6] According to Barnes, Boyce was also "absolved of approximately $75,000 in liability/debt, and forgiven approximately $30,000 in liability/debt related to" a certain building.

1. ACS contends that the trial court erred in applying strict scrutiny to the employment agreement's restrictive covenants. We agree.

Restrictive covenants "which impose[ ] an unreasonable restraint on trade [are] void as against public policy."[7] Whether the restrictions are reasonable is a question of law for the court.[8] In resolving the issue, restrictive covenants are subject to three levels of judicial scrutiny: "strict scrutiny, which applies to employment contracts; middle or lesser scrutiny, which applies to professional partnership agreements; and much less scrutiny, which applies to sale of business agreements."[9]

ACS contends that the covenants are ancillary to the sale of a business and are therefore subject to much less scrutiny. Boyce argues that the restrictive covenants are part of the employment agreement and are therefore subject to strict or middle scrutiny. Significantly, "[w]hen a portion of a covenant not to compete which is a part of a sale of a business interest is found to be unreasonable, the court has tended ... to uphold the remaining portions of the covenant by 'blue penciling' or severing the overly broad restrictions."[10] In the context of employment contracts, however, overly broad covenants are generally not severable.[11] Nevertheless, "if a contract for the sale of a business and an employment contract are part of the same transaction they may be construed together to supply missing elements and blue penciled to make overbroad terms valid."[12]

> [W]here a trial judge is asked to determine the enforceability of a noncompetition covenant which the buyer of a business contends was given ancillary to the covenantor's relinquishment of his interest in the business to the buyer, and not given solely in return for the covenantor's continued employment, the judge must determine the covenantor's status. If it appears that his bargaining capacity was not significantly greater than that of a mere employee, then the covenant should be treated like a covenant ancillary to

---

[7] *Northside Hosp. v. McCord*, 245 Ga. App. 245, 247 (2) (537 SE2d 697) (2000) (noncompetition covenant found to be unreasonable).

[8] See *Pittman v. Coosa Med. Group*, 300 Ga. App. 529, 531 (1) (685 SE2d 753) (2009).

[9] *New Atlanta Ear, Nose & Throat Assoc. v. Pratt*, 253 Ga. App. 681, 683 (1) (a) (560 SE2d 268) (2002).

[10] *Watson v. Waffle House*, 253 Ga. 671 (2) (324 SE2d 175) (1985).

[11] See id. at 671-672 (2).

[12] *Lyle v. Memar*, 259 Ga. 209, 210 (378 SE2d 465) (1989). Compare *Watkins v. Avnet, Inc.*, 122 Ga. App. 474, 476-477 (4) (177 SE2d 582) (1970) (construing contract under rules applicable to a contract for employment even though the contract at issue related to the sale of a business).

an employment contract, and as such, it should be enforced as written or not at all.[13]

The record shows that Boyce was a co-owner of ACS and that he willingly entered into the sales transaction. Although Boyce received only $12,500 for the limited number of shares he sold to Barnes Family Holdings, Boyce wanted to bring George Barnes into the company. According to Boyce, Barnes "brought to the table financial resources and supposed know-how and a track record . . . in taking companies from small to very large." Notwithstanding Boyce's claim of "disparate levels of business acumen" between the parties, the only reasonable conclusion to be drawn from the evidence is that Boyce, as a principal of ACS, was on a relatively equal footing with Barnes in negotiating the stock purchase agreement and the employment agreement, and his bargaining capacity was therefore significantly greater than that of a mere employee.[14]
Although Boyce was more than a mere employee,

[t]his Court has consistently held that when parties execute separate contracts for the seller's sale of the business and the seller's subsequent employment and each contract contains different restrictive covenants, the restrictive covenants in the employment contract are subject to strict scrutiny.[15]

Here, however, the contracts do not contain different restrictive covenants. Given (1) that the delivery of the employment agreement was a condition precedent to the holding company's obligations under the stock purchase agreement;[16] (2) that the employment agreement and the stock purchase agreement were contemporaneous, with ACS and Boyce parties to each contract; (3) that the stock purchase agreement vested control of ACS with Barnes Family Holdings; and (4) that Boyce was not a mere employee when he negotiated the sale of a majority stake in ACS, we find that the restrictive covenants in the employment agreement were ancillary to the sale of a business and subject to much less scrutiny.[17] "Conse-

[13] (Punctuation omitted.) *White v. Fletcher/Mayo/Assoc.*, 251 Ga. 203, 208 (303 SE2d 746) (1983). See *S. Hammond Story Agency v. Baer*, 202 Ga. App. 281 (414 SE2d 287) (1991).

[14] See, e.g., *Drumheller v. Drumheller Bag & Supply*, 204 Ga. App. 623, 626-627 (1) (420 SE2d 331) (1992).

[15] *Hilb, Rogal &c., Inc. v. Holley*, 284 Ga. App. 591, 595-596 (1) (644 SE2d 862) (2007). See *Russell Daniel Irrigation Co. v. Coram*, 237 Ga. App. 758, 759 (1) (516 SE2d 804) (1999).

[16] See *Reed v. Eastern Elec. &c. Co.*, 194 Ga. App. 650, 651 (391 SE2d 472) (1990).

[17] See *Dalrymple v. Hagood*, 246 Ga. 235, 236 (271 SE2d 149) (1980) (where bill of sale was signed at the same time as employment contract the employment agreement was treated

quently, any overbroad, indefinite or vague restrictions do not invalidate the covenants in their entirety but require blue penciling so as to make overbroad terms valid."[18]

2. AMC further contends that the trial court erred in ruling that the noncompetition covenant was overly broad and unenforceable. We agree.

> Where the sale of a business is involved, the purchaser's interest in what he has acquired cannot be effectively realized unless the seller agrees not to act so as to diminish the value of what has been sold. It follows that the reasonableness of any covenant not to compete ancillary to the sale of a business must be measured on the basis of whether the restricted activity protects the purchaser's legitimate business interests, i.e., the value of the business and its good will.[19]

The trial court found that the noncompete provision was overbroad because it precluded Boyce from working for a competing business in any capacity.[20] However, "the much lesser scrutiny afforded sale of business contracts would allow the covenant to restrict [Boyce] from working in the specified business area for any organization in any capacity."[21]

Boyce argues that no matter the level of scrutiny, the noncompete provision is too vague to be enforceable, and consequently the trial court cannot use the "blue pencil" to reform a clause that is void for vagueness on its face.[22] We agree that there is no defined business activity which is prohibited by the covenant at issue, only a prohibition against being "connected with or concerned in any

---

as ancillary to the sale of business); *Ins. Center v. Hamilton*, 218 Ga. 597, 601-602 (2) (129 SE2d 801) (1963) (employment contract and sale of business covered the same transaction); *Drumheller*, 204 Ga. App. at 627 (1) (noncompetition agreement ancillary to sale of business and not to continued employment). Although Boyce also argues that a middle level of scrutiny could apply, the transaction did not contemplate a professional partnership arrangement. Rather, Boyce was entitled to a specified salary and the passive benefits of owning a minority share in a closely held corporation. See, e.g., *West Coast Cambridge v. Rice*, 262 Ga. App. 106, 109 (1) (584 SE2d 696) (2003) ("a basic characteristic of professional partnership agreements is that the contracting professional expects to derive economic benefits through active participation in the professional partnership or corporation").

[18] (Punctuation omitted.) *Drumheller*, 204 Ga. App. at 627 (1).

[19] (Punctuation omitted.) *Hicks v. Doors by Mike*, 260 Ga. App. 407, 410 (1) (579 SE2d 833) (2003).

[20] See *Ken's Stereo-Video Junction v. Plotner*, 253 Ga. App. 811, 812-813 (1) (560 SE2d 708) (2002).

[21] *Habif, Arogeti & Wynne, P.C. v. Baggett*, 231 Ga. App. 289, 295 (2) (c) (498 SE2d 346) (1998).

[22] See *Waste Mgmt. of Metro Atlanta v. Appalachian Waste Systems*, 286 Ga. App. 476, 480 (1) (649 SE2d 578) (2007).

business enterprise or employment which shall be in competition with the business of [ACS]." In the context of agreements ancillary to employment, if "the nature of the business activities in which the employee is forbidden to engage is not specified with particularity," we have found that the covenant was unreasonable because the prohibited activity was too indefinite to be enforced.[23]

Logically, if a provision is indefinite for purposes of covenants ancillary to employment agreements, the provision does not spring into a state of definiteness in the context of a sale of business.[24] Nevertheless, as stated earlier, if sale of business and employment agreements "are part of the same transaction they may be construed together to supply missing elements and blue penciled to make overbroad terms valid."[25] The business of ACS is defined in the stock purchase agreement as "the business of providing network engineering services and other computer related services and products." Viewing the contemporaneous agreements together, Boyce was sufficiently apprised of the nature of the business with which he could not compete.[26] We conclude that because the covenant not to compete was not overly broad and because there remain material issues of fact with respect to its breach, the trial court erred in granting summary judgment to Boyce on this claim.

3. ACS further contends that the trial court erred in finding the nonsolicitation provision in the employment agreement overly broad and unenforceable. The trial court applied the rule that in the context of covenants not to solicit and covenants not to compete ancillary to employment, "if one of them is unenforceable, then they are all unenforceable."[27] In light of the availability of the blue pencil

---

[23] *Uni-Worth Enterprises v. Wilson*, 244 Ga. 636, 639 (261 SE2d 572) (1979). See *Dixie Bearings, Inc. v. Walker*, 219 Ga. 353, 357 (133 SE2d 338) (1963); *Atlanta Bread Co. Intl. v. Lupton-Smith*, 292 Ga. App. 14, 18 (2) (663 SE2d 743) (2008) (covenant in franchise agreement). For example, where the employee is forbidden from engaging in " 'any kind or character of business identical or similar with any business operated by' the employer," the contract is "defective and void because it is indefinite, and for this reason unreasonable. . . ." *Friedman v. Friedman*, 209 Ga. 653 (74 SE2d 860) (1953).

[24] See, e.g., *Drumheller*, 204 Ga. App. at 628 (3) (contractual provision that could be construed as restricting almost any business activity was remanded to the trial court with direction that it narrow the restriction to those enumerated activities necessary to protect appellee's business).

[25] *Lyle*, 259 Ga. at 210.

[26] See *Bennett v. Ga. Indus. Catering Co.*, 222 Ga. 127, 129-131 (2) (149 SE2d 81) (1966) (the customer list delivered contemporaneous with the contract provided appellant with sufficient clarity to determine if he was selling to customers in violation thereof); *Hicks*, 260 Ga. App. at 410-412 (1) (agreement's failure to specifically define numerous terms, such as "products," did not render it unenforceable; rather, the restricted activity of appellant's participation in a residential gutter business protected the legitimate business interests of the purchaser).

[27] *Advance Technology Consultants v. Roadtrac*, 250 Ga. App. 317, 320 (2) (551 SE2d 735) (2001).

rule of severability, the rule does not apply.[28] The trial court also found, however, a lack of evidence of a breach. We agree.

ACS contends that because Westmoreland told ACS that Westmoreland intended to "upgrade the system," ACS has reason to believe that Westmoreland was satisfied with ACS's services. ACS argues that Boyce nevertheless knew that both Westmoreland and Stone were not satisfied with ACS and used the information gained while he was employed by ACS to obtain their business. We cannot agree that any evidence supports this conclusion. Boyce was arguably prohibited under his agreement with ACS from inducing or soliciting Westmoreland or Stone to cancel its business with ACS and hire Boyce. However, affidavits from Shannon and Stone's principal, Kice H. Stone, affirmatively show that Westmoreland and Stone had become displeased with ACS's service before Boyce left ACS, and that Westmoreland and Stone had "procured" and "requested," respectively, Boyce's services thereafter. Accordingly, Boyce pointed to evidence showing that he did not induce or solicit Westmoreland or Stone to leave ACS, but that each did so on its own initiative.[29] Because Boyce discharged his burden of showing an absence of evidence as to ACS's claim that he breached the non-solicitation covenant, ACS was required to "come forward with evidence giving rise to a triable issue."[30] Although Barnes submitted an affidavit, there remained no evidence, absent speculation, of a breach. Although there may be other facts in dispute among the parties, viewing the evidence in a light most favorable to ACS, as nonmovant, there remains no genuine issue of material fact as to Boyce's violation of the nonsolicitation covenant. The trial court's grant of summary judgment on this claim must be affirmed

*Judgment affirmed in part and reversed in part. Blackburn, P. J., and Adams, J., concur.*

DECIDED MARCH 29, 2010 —
RECONSIDERATION DENIED APRIL 13, 2010.

*Bush, Crowley, Leverett & Leggett, Joseph S. Bloodworth*, for appellant.

---

[28] The basis of the rule is that "in restrictive covenant cases strictly scrutinized as employment contracts, Georgia does not employ the 'blue pencil' doctrine of severability." Id. That doctrine does apply in the context of covenants ancillary to the sale of business. See *Watson*, 253 Ga. at 671-672 (2).

[29] See *Waldeck v. Curtis 1000, Inc.*, 261 Ga. App. 590, 593 (583 SE2d 266) (2003) ("solicitation requires some type of affirmative action").

[30] *Wellstar Health System v. Painter*, 288 Ga. App. 659, 660 (655 SE2d 251) (2007).

672

*Sell & Melton, James D. Garner, Jeffrey B. Hanson*, for appellee.