**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and PINSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

***DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.***

**October 13, 2021**

# In the Court of Appeals of Georgia

A21A1114. BB&T INSURANCE SERVICES, INC. v. HOYT E. RENNO, JR. et al.

DILLARD, Presiding Judge.

BB&T Insurance Services, Inc. appeals from the trial court's grant of summary judgment in favor of Hoyt E. Renno, Jr. and John Snellings Walters Insurance Agency, Inc. d/b/a Snellings Walters Insurance Agency. In doing so, BB&T asserts that the trial court erred in granting the motion because (1) Renno's employment agreement with it was ancillary to the sale of a business, (2) the terms of the agreement were enforceable under lesser scrutiny, (3) it was not estopped from enforcing the agreement, (4) Renno violated the agreement, and (5) there was sufficient evidence to withstand summary judgment on whether Snellings Walters interfered with its business relationships. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to BB&T (*i.e.*, the non-moving party),[1] the record shows that on April 2, 2001, it entered into an employment agreement with Renno. This agreement noted that BB&T purchased Stephens & Company Insurance Services, Inc.—a company for which Renno was both a shareholder and director—and provided that Renno would be employed by BB&T. The document further reflected that BB&T wished to "secure [Renno's] participation in the business" for "reasonable and proper compensation," protect its proprietary and confidential information, and protect itself in the event Renno's employment was terminated. And under the terms of the contract, Renno was named a vice president of BB&T, and his "official position" was "Business Insurance Agent III."

Earlier, on February 8, 2001, Renno and two fellow minority shareholders in Stephens & Co. executed a document by which the majority shareholder transferred 5,985 of his 15,750 shares to the three minority shareholders (1,995 shares each), leaving them with 7,245 shares each and the majority shareholder with 9,765 shares. The document also provided that the stock transfer closing would take place "one (1)

---

[1] *See, e.g.*, *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) ("In our de novo review of the grant of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." (punctuation omitted)).

2

day prior to, and shall be contingent upon[ ] consummation of the contemplated business reorganization between [Stephens & Co.] and BB&T Corporation." Thus, before signing the employment agreement on April 2, 2001, Renno and the three other joint shareholders and directors of Stephens & Co. executed a transfer of assets from that company to BB&T in the reorganization.

Following the execution of these various agreements, Renno worked for BB&T until April 23, 2018, at which time both he and another employee, Cameron Davis, notified BB&T that they were resigning from their positions, effective immediately. After Renno's resignation, BB&T took inventory of his office and discovered that three-ring binders containing customer information were missing. Indeed, on the eve of his resignation, Renno was seen removing a number of items from his office, including three-ring binders. BB&T also found that, prior to his resignation, its computer system prevented Renno from exporting a contact list of some 2,000 to 3,000 of his customers to his personal email address. Additionally, just before submitting his resignation, Renno used his BB&T email account to send an email to his personal account. This email blind-copied BB&T clients to inform them of Renno's impending resignation and included within the signature line a hyperlink to his personal LinkedIn page, which had been updated to show his new professional

email address and place of employment—Snellings Walters. Davis sent a similar email within the next hour. Renno and Davis then left BB&T's office and went to work for Snellings Walters that same day.

On the day Renno and Davis resigned from BB&T, Renno texted another BB&T employee, Cheryl O'Pry, requesting that she meet him and Davis for breakfast before work; and the following day, a principal from Snellings Walters sent O'Pry a text message. Shortly thereafter, O'Pry also submitted her resignation to BB&T in order to go work for Snellings Walters.

In the wake of these resignations, multiple BB&T clients from Cobb County and counties contiguous to Cobb moved their business to Snellings Walters. And since his departure, Renno has sold and serviced insurance products in those counties. Indeed, as of April 2019, BB&T claimed it had suffered $949,395 in lost commission revenue.[2]

BB&T filed suit against Renno, asserting that he breached his employment agreement with regard to the provisions for non-competition, customer solicitation,

_____

[2] BB&T appears to suggest that the $949,395 in lost commission revenue was all attributable to Renno leaving the company, but the evidence they cite in support of this assertion only reflects that specific businesses left the agency following Renno's departure, *not* that those businesses left and followed Renno to his new place of employment.

employee solicitation, and confidentiality.[3] BB&T later amended its complaint to add a claim against Snellings Walters for tortious interference with its contractual and employment relationships. Renno and Snellings Walters filed a motion for summary judgment, and BB&T filed its own motion for partial summary judgment. Following a hearing on the matter, the trial court issued an order on the parties' competing motions. Specifically, the trial court concluded that the relevant covenants existed in an employment agreement, rather than within the sale agreement for Stephens & Co. to BB&T, and thus, they were subject to strict scrutiny.

In reaching its decision, the trial court concluded that the restrictive covenants related only to Renno's employment and not to the sale of the business. And as a result, the court determined that Renno had no more bargaining power with BB&T than an ordinary employee, thus supporting the application of strict scrutiny to those

---

[3] BB&T also brought a claim for violation of the Georgia Computer Systems Protection Act, but is no longer pursuing that claim. As a result, we deem it abandoned. *See Grogan v. City of Dawsonville*, 305 Ga. 79, 89 (4) n.7 (823 SE2d 763) (2019) (explaining that the Court will not address potential issue or argument that appellant did not raise on appeal); *Rollins v. Legg*, 179 Ga. 85, 85 (2) (175 SE 382) (1934) ("The petition prayed for attorney's fees on account of bad faith and litigiousness on the part of the sheriff. The plaintiff in his brief does not argue his alleged right to an award of attorney's fees, and this feature of the case is treated as having been abandoned." (emphasis supplied)); *Jones v. Bd. of Regents of Univ. Sys. of Ga.*, 262 Ga. App. 75, 79 (3) (585 SE2d 138) (2003) (deeming issue not argued on appeal abandoned).

5

covenants. Alternatively, the trial court concluded that Renno's original employment agreement had expired and that subsequent renewals of the contract did not include the sale of Stephens & Co. as consideration. Finally, the court held that, regardless of the level of scrutiny applied, BB&T could not enforce the covenants due to its own breach of the contract. The court also found that no evidence supported the claim that Snellings Walters tortiously interfered with BB&T's business relationships. Accordingly, the trial court granted Renno and Snellings Walters's motion for summary judgment in its entirety and denied BB&T's motion for partial summary judgment. This appeal follows.

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4] And to prevail on a motion for summary judgment, the moving party "must demonstrate that there is no genuine issue of material fact."[5]

---

[4] OCGA § 9-11-56 (c); *accord Cowart*, 287 Ga. at 623 (1) (a).

[5] *Cowart*, 287 Ga. at 623 (1) (a) (punctuation omitted); *accord Montgomery v. Barrow*, 286 Ga. 896, 898 (1) (692 SE2d 351) (2010).

If so, that party is entitled to judgment as a matter of law.[6] This may be done by "either presenting evidence negating an essential element of the plaintiff's claims or establishing from the record an absence of evidence to support such claims."[7] With the foregoing in mind, we turn to BB&T's claims of error.

1. For starters, BB&T asserts that the restrictive covenants in Renno's employment contract are ancillary to the sale of a business and, thus, are subject to much less scrutiny and may be blue penciled to make any overbroad terms valid. Alternatively, BB&T argues that there is a genuine issue of material fact on this question. We disagree.[8]

---

[6] *Cowart*, 287 Ga. at 623 (1) (a); *Kaplan v. City of Sandy Springs*, 286 Ga. 559, 560 (1) (690 SE2d 395) (2010).

[7] *Cowart*, 287 Ga. at 623 (1) (a).

[8] Because the employment agreement was executed in 2001, we apply the common law existing at that time, prior to enactment of the Georgia Restrictive Covenant Act. *See Murphree v. Yancey Bros. Co.*, 311 Ga. App. 744, 747 (716 SE2d 824) (2011) ("[O]n May 11, 2011, the Georgia General Assembly amended OCGA § 13-8-53 to permit blue penciling, in that 'a court may modify a covenant that is otherwise void and unenforceable so long as the modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties.' OCGA § 13-8-53 (d). But the amended Code only applies to contracts entered into on or after May 11, 2011. See Ga. L. 2011, § 5.").

Restrictive covenants that impose an unreasonable restraint on trade are void as against public policy.[9] And whether restrictive covenants are reasonable is a question of law, which we review *de novo*.[10] In this regard, our courts apply "different levels of scrutiny to restrictive covenants depending generally upon whether the contract at issue is an employment contract, a contract for the sale of a business, or a professional partnership agreement[.]"[11] So, traditionally, our courts "divide restrictive covenants into covenants ancillary to an employment contract, which receive strict scrutiny and are not blue-penciled, and covenants ancillary to a sale of

---

[9] *Am. Control Sys., Inc. v. Boyce*, 303 Ga. App. 664, 667 (1) (694 SE2d 141) (2010); *Northside Hosp. v. McCord*, 245 Ga. App. 245, 247 (2) (537 SE2d 697) (2000).

[10] *See Vulcan Steel Structures, Inc. v. McCarty*, 329 Ga. App. 220, 222 (764 SE2d 458) (2014) ("[T]he reasonableness of a restrictive covenant is a question of law, which is subject to de novo review."); *Am. Control Sys.*, 303 Ga. App. at 667 (1) ("Whether the restrictions are reasonable is a question of law for the court."); *Pittman v. Coosa Med. Grp.*, 300 Ga. App. 529, 531 (1) (685 SE2d 753) (2009) ("The reasonableness of the restrictions is a question of law.").

[11] *Swartz Invs., LLC v. Vion Pharms., Inc.*, 252 Ga. App. 365, 368 (2) (556 SE2d 460) (2001); *see Am. Control Sys.*, 303 Ga. App. at 667 (1) ("In resolving the issue, restrictive covenants are subject to three levels of judicial scrutiny: strict scrutiny, which applies to employment contracts; middle or lesser scrutiny, which applies to professional partnership agreements; and much less scrutiny, which applies to sale of business agreements." (punctuation omitted)).

8

business, which receive much less scrutiny and may be blue-penciled."[12] And we have consistently held that "when parties execute separate contracts for the seller's sale of the business and the seller's subsequent employment and each contract contains different restrictive covenants, the restrictive covenants in the employment contract are subject to strict scrutiny."[13]

In conducting this analysis, we consider the relative bargaining power of the parties and whether there is independent consideration for the restrictive covenant.[14]

---

[12] *Swartz Invs., LLC*, 252 Ga. App. at 368 (2); *see Am. Control Sys.*, 303 Ga. App. at 667 (1); *see also Atlanta Bread Co. Int'l v. Lupton-Smith*, 285 Ga. 587, 589 (2) (679 SE2d 722) (2009) ("When such restraints [on trade] are found in franchise or distributorship agreements, our jurisprudence has held time and again that these restraints are subject to strict scrutiny, receiving the same treatment as noncompetition covenants found in employment contracts.").

[13] *Am. Control Sys.*, 303 Ga. App. at 668 (1) (punctuation omitted); *accord Hilb, Rogal & Hamilton Co. of Atlanta v. Holley*, 284 Ga. App. 591, 595-96 (1) (644 SE2d 862) (2007); *see Russell Daniel Irrigation Co. v. Coram*, 237 Ga. App. 758, 758-59 (1) (516 SE2d 804) (1999) ("Strict scrutiny applies to covenants ancillary to employment agreements, whereas a much lesser degree of scrutiny applies to covenants ancillary to the sale of a business; a middle level of scrutiny applies to covenants found in professional partnership agreements.").

[14] *See Am. Control Sys.*, 303 Ga. App. at 667-68 (1) ("If it appears that his bargaining capacity was not significantly greater than that of a mere employee, then the covenant should be treated like a covenant ancillary to an employment contract, and as such, it should be enforced as written or not at all."); *Swartz Invs., LLC*, 252 Ga. App. at 369 (2) (explaining that courts consider the relative bargaining power of the parties and whether there was independent consideration for the restrictive

And courts have reasoned that contracts of employment receive strict scrutiny because they can involve "parties of unequal bargaining power,"[15] while contracts for sales of business interests receive less scrutiny because they are more likely to be "entered into by parties on equal footing."[16]

Here, BB&T argues that the restrictive covenants at issue are ancillary to its purchase of Stephens & Co. and, thus, are subject to much less scrutiny. But Renno contends that the restrictive covenants are solely part of his employment agreement and, thus, are subject to strict scrutiny. The trial court agreed with Renno and, even viewing the evidence in the light most favorable to BB&T, we do as well.

---

covenant); *see also Rash v. Toccoa Clinic Med. Assocs.*, 253 Ga. 322, 326 (320 SE2d 170) (1984) "("[I]nequality of bargaining power is a determining factor in judging the reasonableness of a restrictive covenant[.]"); *White v. Fletcher/Mayo/Assocs.*, 251 Ga. 203, 208 (303 SE2d 746) (1983) ("If it appears that [the covenantor's] bargaining capacity was not significantly greater than that of a mere employee, then the covenant should be treated like a covenant ancillary to an employment contract, and as such, it should be enforced as written or not at all." (punctuation omitted)).

[15] *Drumheller v. Drumheller Bag & Supply, Inc.*, 204 Ga. App. 623, 626 (1) (420 SE2d 331) (1992); *accord Watson v. Waffle House, Inc.*, 253 Ga. 671, 672 (2) (324 SE2d 175) (1985). *Cf. Rash*, 253 Ga. at 326 (2) ("[Because] the employee who agrees to the covenant may have done so from an inferior bargaining position, and since the covenant may seriously impair his ability to earn a living, the courts have traditionally given greater scrutiny to restrictive covenants within employment contracts, as opposed to such covenants contained in business sales agreements.").

[16] *Drumheller*, 204 Ga. App. at 626 (1); *accord Watson*, 253 Ga. at 672 (2).

The record shows that although Renno's employment agreement *references* the sale of Stephens & Co. to BB&T, only the employment agreement contains the relevant restrictive covenants, and this contract specifically provides that its purpose is to create an employment relationship between BB&T and Renno. As a result, this situation is similar to those in which the two agreements contain *different* restrictive covenants rather than the *same* restrictive covenants—*i.e.*, the contracts are considered separate with strict scrutiny applied to the employment agreement.[17]

_____

[17] *Compare Hilb, Rogal & Hamilton Co. of Atlanta*, 284 Ga. App. at 595-96 (1) ("This Court has consistently held that when parties execute separate contracts for the seller's sale of the business and the seller's subsequent employment and each contract contains different restrictive covenants, the restrictive covenants in the employment contract are subject to strict scrutiny."); *Russell Daniel Irrigation Co. v. Coram*, 237 Ga. App. 758 (1) (516 SE2d 804) (1999) ("[T]he limited partnership agreement had its own restrictive covenant in addition to the restrictive covenant contained in the employment agreement, which subjects the latter covenant to strict scrutiny."); *Johnstone v. Tom's Amusement Co.*, 228 Ga. App. 296, 298 (1) ( 491 SE2d 394) (1997) ("If, as plaintiff contends, the restrictive covenant in the employment contract should be considered part and parcel of the sales contract, why was the restrictive covenant in the sales contract necessary? The answer lies in the restrictive covenants themselves. Each covenant stands on its own. Each covenant is separate and complete." (punctuation omitted)); *Arnall Ins. Agency, Inc. v. Arnall*, 196 Ga. App. 414, 419 (2) (396 SE2d 257) (1990) (physical precedent only) ("[T]he employment contract is part of a larger transaction. (Indeed, . . . the employment contract makes reference to the sales agreement.) Nevertheless, we must construe the restrictive covenant contained in the employment contract as just that—a covenant contained in an employment contract. After all, the employment contract and the sales contract are separate documents between separate (albeit corporately related) parties and with separate subject matters."); *Watkins v. Avnet, Inc.*, 122 Ga. App. 474, 476-77 (4) (177

11

Additionally, the acquisition agreement between Stephens & Co. and BB&T provides that, along with the other three shareholders, "[o]n the Closing Date, BB&T Insurance shall enter into an Employment Agreement with . . . Hoyt E. Renno, Jr." Although the acquisition specifies that in order to "consummate the Acquisition to become effective," Renno would—in addition to the other shareholders—enter into an employment agreement "[a]t or *prior* to the Effective Time"[18] of the acquisition agreement (which was 5:00 p.m. on April 2), the acquisition agreement does not explicitly say it is *contingent* upon Renno's execution of a separate employment agreement.[19] Indeed, in addition to Renno and the other shareholders, this provision

_____

SE2d 582) (1970) ("Although the contract here involved is clearly related to the sale of a business, and in this sense involves only one aspect of a larger transaction, it is nonetheless a contract of employment, and must be construed under the rules applicable to the latter."), *with Am. Control Sys.*, 303 Ga. App. at 668 (1) (holding that employment agreement was ancillary to sale of a business when, *inter alia*, the two agreements contained the same restrictive covenants and delivery of the employment agreement was a condition precedent to obligations under the stock purchase agreement).

[18] (Emphasis supplied).

[19] *Cf. White*, 251 Ga. at 203, 207 (noting that purchase of company was contingent upon appellant signing an employment contract with restrictive covenants).

of the sales agreement also required that unspecified employees included on a "Schedule 8"[20] *also* enter into employment agreements.[21]

The restrictive covenants in the employment agreement also do not have consideration independent or separate from Renno's employment.[22] Renno was, of

[20] "Schedule 8" does not appear to be in the appellate record.

[21] *Cf. White*, 251 Ga. at 203, 207 ("Prior to the merger [appellant] had no written employment contract with [his employer]. [The purchasing company] conditioned its purchase of [the employer] on [the appellant] signing agreements containing restrictive covenants in favor of [the employer] and [the purchaser]. Only three other employees of [the employer] . . . signed such agreements; no others, including the fourth largest shareholder and two other senior vice-presidents, made such agreements. [The appellant] testified that at the time [the employer] told him he should sign the agreements because they were necessary to guarantee his job and secure broader career opportunities for him. There was trial testimony for appellees that [the employer's] biggest client was serviced out of the Atlanta office, that [the appellant] supervised service of this and other accounts, and that he was asked to sign the covenants because, in light of his client contacts, he was considered a key employee.").

[22] *Cf. Swartz Invs., LLC*, 252 Ga. App. at 369 (2) ("[W]hen an employee agrees to subject himself to possible future restrictions, he does so in exchange for the opportunity to have the job. He really gets nothing other than the opportunity to work in exchange for giving up this aspect of his freedom. . . . The lack of consideration for an employee's restrictive covenant is an additional justification for subjecting employment agreements to heightened scrutiny." (punctuation omitted)); *Russell Daniel Irrigation Co.*, 237 Ga. App. at 759 (1) ("If the business seller or potential partner as a part of the transaction also enters into a separate employment agreement with its own additional non-compete covenant, then the consideration received for that covenant is usually less (generally employment benefits such as salary and insurance coverage), subjecting it to a stricter level of scrutiny. The context and

course, one of only four shareholders in Stephens & Co., and he received a share of the profits from the sale in an amount of approximately $1,600,000. But the business acquisition also contemplated entry into employment agreements by other Stephens & Co. employees—the "Schedule 8" employees discussed *supra*—who were *not* shareholders and, thus, did not receive a share of the sale profits.[23] Additionally, while the non-competition restrictive covenants provide that part of their consideration is "the acquisition of [Stephens & Co.] assets by BB&T,"[24] the terms

---

consideration of the two restrictive covenants being different, they are subject to different levels of scrutiny.").

[23] *See White*, 251 Ga. at 207 ("[T]he profit appellant made on his exchange of stock was strictly proportional to that which was received by all other shareholders, ninety-four percent of whom were not asked to make such covenants[.] Thus, it is problematical whether his profit constituted consideration for his covenants not to compete, or whether the sole consideration flowing to [appellant] in return for those covenants was his continued employment." (citation omitted)).

[24] The acquisition of Stephens & Co. assets by BB&T does not necessarily mean that the consideration includes the payment Renno received for those assets as a shareholder for Stephens & Co. *See Nat'l Hills Exch., LLC v. Thompson*, 319 Ga. App. 777, 778 (736 SE2d 480) (2013) ("The first rule of contract construction is to determine the parties' intent, and if the language is clear the contract shall be enforced according to its clear terms. In fact, no construction is even permitted when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation.").

14

of the restrictive covenant do not relate to Stephens & Co. in any way.[25] Instead, these terms entirely relate to BB&T, including a period that begins with termination of employment from BB&T.[26] Additionally, in contrast with the non-competition

[25] *Cf. Jenkins v. Jenkins Irrigation, Inc.*, 244 Ga. 95, 100 (3) (259 SE2d 47) (1979) ("When a person sells a business and covenants not to compete in a certain territory, the buyer pays and the seller receives a part of the total purchase price as consideration for that covenant."); *Herndon v. Waller*, 241 Ga. App. 494, 495 (525 SE2d 159) (1999) ("In the usual case, it is the seller who covenants not to compete in order to protect the goodwill the purchaser is buying. And the seller generally receives a part of the purchase price in compensation for his promise not to compete." (citations omitted)); *Carroll v. Ralston & Assocs., P.C.*, 224 Ga. App. 862, 864 (481 SE2d 900) (1997) ("The vendor who signs a covenant not to compete when selling a business receives an equivalent for his partial abstention from that business, in the increased price paid him for it on account of his covenant. The covenant operates to his affirmative pecuniary benefit and against his impoverishment, in that, while being paid for desisting from the particular business in the locality covered by it, he may still enter upon other pursuits of gain in the same locality or upon this one in other localities." (punctuation omitted)).

[26] *See generally Farmer v. Airco, Inc.*, 231 Ga. 847, 851 (204 SE2d 580) (1974) ("The object of a non-competition covenant in an agreement for the sale of a business, unlike ancillary covenants in a contract of employment, is to insure that the buyer gets the full value of the business being acquired. A sale of good will implies some obligation to deliver the business sold by refraining from competition with it."); *Ins. Ctr., Inc. v. Hamilton*, 218 Ga. 597, 602 (2) (129 SE2d 801) (1963) (noting that a non-competition period that starts with the termination of employment is "customary in cases of noncompetitive covenants ancillary to an employment contract").

15

covenants, the confidentiality covenant does *not* reference BB&T's acquisition of Stephens & Co. as any of its consideration.

And on the issue of bargaining power, Renno averred he "did not have the ability to negotiate the terms of the Employment Agreement that [he] signed with BB&T, including the covenants stated in the agreement." Additionally, a BB&T representative testified that Renno alone, as a minority shareholder, could not independently change any terms of the deal and was limited to giving "input in the negotiation" and providing "input on the deal." Relatedly, prior to the sale of Stephens & Co. to BB&T, the majority shareholder approached the minority shareholders to inform them that he had been diagnosed with terminal cancer and, accordingly, was interested in selling the company. The three minority shareholders discussed the possibility of buying the majority shareholder's stock but never made such a proposal. Instead they proceeded with the *majority shareholder's idea* to sell the company. And prior to the actual acquisition, Renno and the other shareholders had only two meetings with BB&T representatives to hear details of their proposal. Furthermore, the stock transfer agreement that increased Renno's ownership percentage of Stephens & Co. reflects that the BB&T negotiation occurred prior to Renno's execution of same because this agreement was contingent upon the sale of

16

Stephens & Co. *to* BB&T. So, the entire time that the sale of Stephens & Co. to BB&T was being negotiated, Renno remained one of three minority shareholders, while the sole majority shareholder owned *51 percent* of the company. Furthermore, it is undisputed that Renno did not have independent legal counsel. And while it is true that Renno communicated with Stephens & Co.'s counsel, there is no evidence that this counsel advised Renno on the terms of the employment agreement.[27] There is, then, no evidence showing that Renno had bargaining power *greater* than that of a mere employee to negotiate the sales agreement between Stephens & Co. and BB&T.[28]

---

[27] *See Drumheller*, 204 Ga. App. at 626-27 (1) (considering, *inter alia*, that plaintiffs were represented by counsel during negotiations and that the attorney approved of the restrictive covenants before the sale).

[28] *See White*, 251 Ga. at 207 ("It is clear that despite his ownership of a relatively small, interest in [the acquired company] and his potential veto power over the merger, [appellant] had no control over overall management of [the acquired company], and in fact had so little bargaining clout within [the acquired company] that he was unable to prevent his own termination. He was nothing more than an employee, albeit an important one, and as an employee [the appellant] could reasonably have assumed that if he did not do as [the acquired company] and [the purchaser] wished he would be stigmatized as not being a team player, thereby jeopardizing his career prospects with [the acquired]."). *Cf. Am. Control Sys.*, 303 Ga. App. at 668 (1) (evidence showed that party's bargaining power was significantly greater than a mere employee while negotiating stock transfer agreement when he was a co-owner, willingly entered into the sales transaction, and wanted to benefit from other company's financial resources and track record).

Accordingly, we agree with the trial court that the evidence, even viewed in the light most favorable to BB&T, shows that Renno's employment agreement was not ancillary to the sales agreement and, thus, strict scrutiny applies.[29]

2. BB&T contends that the restrictive covenants in the agreement were enforceable as written or with blue penciling. But because the employment contract was not ancillary to the sales agreement, we will not consider the terms of the contract under lesser scrutiny. So, we agree with the trial court that the restrictive covenants are unenforceable under strict scrutiny.

Looking to the language at issue in the employment agreement, the restrictive covenants encompass provisions for non-competition and non-recruitment. We will address each of them in turn.

a. *Non-Competition Provision.* The non-competition provisions appear in Section 8 (a) (iii) and (iv) of the employment agreement, as follows:

> For and in consideration of this Agreement, the employment of Employee by BB&T Insurance, the Term of this Agreement in Section 3 and the limited severance package in Section 5 (b) and the acquisition of the Agency's assets by BB&T Insurance, Employee agrees that,

---

[29] Based upon our conclusion in this division, we need not address the trial court's alternative ground for applying strict scrutiny, which was that each renewal of the contract no longer included the sale of Stephens & Co. as consideration.

unless specifically authorized by BB&T Insurance in writing, Employee will not for a period of two years after Employee's employment with BB&T Insurance has terminated (whatever the reason for the end of the employment relationship): . . . . (iii) Engage in any "Competitive Activity" (as defined below) with any "BB&T Insurance Customer" (as defined below); or (iv) Engage in any "Competitive Activity" (as defined below) within the "Restricted Territory" (as defined below).

The provision goes on to define "Competitive Activity" as "the sale, trade or service or attempted sale, trade or service of insurance products." A "BB&T Insurance Customer" is defined as

any company or individual customer of BB&T Insurance (1) who, within the two-year period ending with the termination of Employee's employment hereunder, contacted Employee or a person supervised by Employee or was contacted or served by Employee or by a person supervised by Employee regarding the sale, trade or service or the attempted sale, trade or service of insurance products or any other business activities of BB&T Insurance; or (2) who purchased products or services from BB&T Insurance during Employee's employment with BB&T Insurance.

Finally, "Restricted Territory" is defined as "(1) Cobb County, Georgia; and (2) any county contiguous to Cobb County, Georgia."

As previously discussed, restrictive covenants that are ancillary to an employment contract are "subject to strict scrutiny and will be voided by Georgia courts if they impose an unreasonable restraint on trade."[30] Thus, such a covenant will be upheld so long as it is not unreasonable and is "founded on a valuable consideration, and is reasonably necessary to protect the interest of the party in whose favor it is imposed, and does not unduly prejudice the interests of the public."[31] And in terms of the capacity for competition, "a former employer does not need a restrictive covenant that prohibits work for a competitor in *any* capacity in order to protect its legitimate interests[.]"[32] Indeed, a reasonable restriction "sets forth with specific particularity those activities related to the employer's business in which the

---

[30] *Stultz v. Safety & Compliance Mgmt., Inc.*, 285 Ga. App. 799, 801 (648 SE2d 129) (2007).

[31] *Hulcher Servs., Inc. v. R.J. Corman R.R. Co.*, 247 Ga. App. 486, 490-91 (4) (543 SE2d 461) (2000).

[32] *Hulcher Servs.*, 247 Ga. App. at 492 (4) (emphasis supplied); *see Howard Schultz & Assocs. of the Se., Inc. v. Broniec,* 239 Ga. 181, 184 (2) (236 SE2d 265) (1977) ("This court has held on several occasions that a covenant wherein the employee agreed not to accept employment with a competitor 'in any capacity' imposes a greater limitation upon the employee than is necessary for the protection of the employer and therefore is unenforceable.").

employee was trained by the employer or worked for the employer, thereby protecting the employer's interests from competition in that regard only."[33]

Applying these principles to the provisions at issue, Section 8 (a) (iii) is overbroad and, thus, unenforceable because it is not limited to BB&T customers with whom Renno had material contact.[34] Additionally, Sections 8 (a) (iii) and (iv) are also

---

[33] *Hulcher Servs.*, 247 Ga. App. at 492 (4) (emphasis supplied).

[34] *See Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 377-78 (1) (297 SE2d 473) (1982) (holding that restrictive covenant was overbroad when it prohibited former employee from working with clients of former employer with whom he did not perform services during his employment, and noting that "[w]ithout the benefit of the trust and confidence built up through the professional-client relationship, [the former employer] does not have the ability to unduly influence clients for his own benefit; and therefore, he does not hold an unfair competitive edge over [his former employer] in relation to those clients from which [his former employer] would need protection"); *Sanford v. RDA Consultants, Ltd.*, 244 Ga. App. 308, 310 (1) (535 SE2d 321) (2000) ("[A] prohibition against doing business with any of an employer's customers, whether or not a relationship existed between the customer and the former employee, is overbroad." (punctuation omitted)); *Dougherty, McKinnon & Luby, P.C. v. Greenwald, Denzik & Davis, P.C.*, 213 Ga. App. 891, 894 (2) (a) (447 SE2d 94) (1994) ("Because of the nature of the professional-client relationship, appellees would have gained some degree of trust, confidence, and rapport with clients for whom it performed services at [the company], and [the company] has a legitimate need to protect itself from the risk that an employee accountant may later use such a relationship to appropriate or 'pirate' such clients for their own benefit. However, the restraint here provides [the company] with greater protection than needed. The former employees have no unfair competitive advantage regarding customers with whom they did not work and had no business relationship while employed at [the company]. The restriction is therefore overbroad." (citation omitted)).

21

overbroad because they prohibit Renno from "the sale, trade or service or attempted sale, trade or service of *insurance products*"[35] and are not limited specifically to those types of insurance products Renno sold during his time with BB&T (*i.e.*, commercial property and casualty insurance).[36] Accordingly, the trial court did not err in concluding that these provisions were unenforceable under an application of strict scrutiny.

b. *Non-Recruitment Provision.* The relevant non-recruitment provision appears in Section 8 (a) (i) of the employment agreement as follows:

> For and in consideration of this Agreement, the employment of Employee by BB&T Insurance, the Term of this Agreement in Section 3 and the limited severance package in Section 5 (b) and the acquisition of the Agency's assets by BB&T Insurance, Employee agrees that,

---

[35] (Emphasis supplied).

[36] *See Puritan/Churchill Chem. Co. v. Eubank*, 245 Ga. 334, 335 (265 SE2d 16) (1980) (Per Curiam) ("[L]anguage which restricts employees from activities in a much more limited fashion than is necessary for the protection of the employer will not withstand the reasonableness test so as to uphold the covenant."); *McNease v. Nat'l Motor Club of Am., Inc.*, 238 Ga. 53, 56 (2) (231 SE2d 58) (1976) ("Under this clause of the contract the employee is in effect prohibited from working in any capacity for a competitor, even in positions unrelated to solicitation and sales. This restriction is larger than is necessary to protect the employer and is therefore unreasonable." (citation omitted)).

unless specifically authorized by BB&T Insurance in writing, Employee will not for a period of two years after Employee's employment with BB&T Insurance has terminated (whatever the reason for the end of the employment relationship): (i) Solicit, encourage or support any employee of BB&T Insurance to leave the employment of BB&T Insurance[.]

This provision is likewise overbroad. The non-solicitation provision is not limited strictly to soliciting BB&T employees into new employment or encouraging them to leave BB&T; it also prohibited Renno from "supporting" any BB&T employee's personal decision to leave the company. In other words, hypothetically, Renno would violate this provision if he ran into a former coworker and supported his or her decision to leave BB&T to care for an ailing parent. Suffice it to say, this provision is "too broad in its scope to sustain a finding that it was needed to protect legitimate business interests."[37]

---

[37] *Lane Co. v. Taylor*, 174 Ga. App. 356, 360 (2) (b) (330 SE2d 112) (1985). *Cf. CMGRP, Inc. v. Gallant*, 343 Ga. App. 91, 95 (2), 97-98 (2) (b) (806 SE2d 16) (2017) (upholding language that said former employee could not "(a) directly or indirectly (i) solicit any employee of the Company to leave such employ to enter the employ of Employee or of any person, firm, or corporation with which the Employee is then associated, or (ii) induce or encourage any such employee of the Company to leave the employment of the Company or to join any other company, or (iii) hire any such employee of the Company, or (iv) otherwise interfere with the relationship between the Company and any employee of the Company"); *Palmer & Cay of Ga.,*

23

Accordingly, each of the restrictive covenants noted *supra* are unenforceable, and the trial court did not err in so concluding.

3. BB&T continues by arguing that it was not estopped from enforcing the employment agreement because it did not breach the contract as the trial court concluded. But in light of our conclusions *supra*, we need not reach this alternative ground.

4. Next, BB&T asserts that Renno violated and continues to violate the restrictive covenants in the employment agreement. In light of our conclusions *supra* that the non-compete and non-recruitment provisions are unenforceable, we need not

---

*Inc. v. Lockton Companies, Inc.*, 273 Ga. App. 511, 514 (1) (615 SE2d 752) (2005) (upholding language that said "the Employee will not, directly or indirectly, attempt in any manner to cause or otherwise encourage any employee of the Company to leave the employ of such corporation"), *reversed on other grounds* 280 Ga. 479 (629 SE2d 800) (2006); *Sanford v. RDA Consultants, Ltd.*, 244 Ga. App. 308, 309, 311 (2) (535 SE2d 321) (2000) (upholding language that said former employee could "not to attempt to employ or assist any other person in employing or soliciting for employment any employee employed by [former employer]"); *Sunstates Refrigerated Servs., Inc. v. Griffin*, 215 Ga. App. 61, 61, 63 (2) (449 SE2d 858) (1994) (upholding language that said former employee could not "employ, attempt to employ or assist anyone else in employing as a manager, executive or salesperson in any competing business any of the appellant's managerial, executive or sales personnel"); *Lane Co.*, 174 Ga. App. at 360 (2) (b) (upholding language in covenant that prevented former employee from seeking to "hire or attempt to hire for another employer any employee of Employer or directly or indirectly cause any such employee to leave his employment in order to work for another").

24

address whether there was evidence to show that Renno violated those terms. And we also need not address whether the trial court erred in concluding that there was no evidence Renno violated the confidentiality provisions of his employment agreement because BB&T abandoned this argument by failing to provide discussion of or citation to legal authority.[38]

5. Finally, BB&T argues that there was sufficient evidence to withstand summary judgment on the question of whether Snellings Walters interfered with BB&T's business relationships. Once again, we disagree.

In order to demonstrate a tortious interference with contract, a plaintiff must prove four elements:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the

---

[38] *See Robinson v. Robinson*, 239 Ga. 323, 324 (1) (236 SE2d 660) (1977) (deeming argument abandoned for purposes of appeal when it was not supported by argument or citation to legal authority as required by rules); *Savage v. Savage*, 234 Ga. 853, 856 (218 SE2d 568) (1975) (same); *Wolf v. Middleton*, 305 Ga. App. 784, 790 (2) (700 SE2d 598) (2010) ("The [appellants], however, failed to support this claim of error with citation to legal authority or legal analysis, as required by Court of Appeals Rule 25 (c) (2). Therefore, this claim of error is deemed abandoned."); *Smith v. State*, 214 Ga. App. 631, 633 (4) (448 SE2d 906) (1994) (deeming argument abandoned when it was not supported by legal authority); CT. APP. R. 25 (c) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned.").

25

intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.[39]

Generally speaking, a so-called improper action means "predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions."[40] It is not enough to show that a defendant "simply persuaded a person to break a contract."[41]

In this regard, BB&T asserts that Snellings Walters was "complicit in, and even orchestrated many of, Renno's illicit activities." In doing so, BB&T points to Snellings Walters's review of Renno's BB&T employment agreement and contends

---

[39] *Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Cmty. Tr.*, 298 Ga. 221, 230 (2) (c) (i) (780 SE2d 311) (2015); *accord Tribeca Homes, LLC v. Marathon Inv. Corp.*, 322 Ga. App. 596, 598 (2) (745 SE2d 806) (2013).

[40] *Am. Bldgs. Co. v. Pascoe Bldg. Sys., Inc.*, 260 Ga. 346, 349 (2) (392 SE2d 860) (1990); *accord Kirkland v. Tamplin*, 285 Ga. App. 241, 244 (1) (b) (645 SE2d 653) (2007); *Batayias v. Kerr-Mcgee Corp.*, 267 Ga. App. 848, 850 (1) (601 SE2d 174) (2004); *Contractors' Bldg. Supply, Inc. v. Gwinnett Sash & Door, Inc.*, 199 Ga. App. 38, 40 (2) (403 SE2d 844) (1991), *overruled on other grounds as recognized by Seckinger v. Holtzendorf*, 200 Ga. App. 604 (409 SE2d 76) (1991).

[41] *Kirkland*, 285 Ga. App. at 244 (1) (b).

26

that Snellings Walters "instructed Renno to only honor his contractual obligations . . . 'where possible.'" But the evidence and testimony to which BB&T cites for this assertion demonstrates something else entirely. It shows that Snellings Walters—while trying to obtain a copy of *Cameron Davis's* BB&T employment contract—advised *him* to "act as if you have a contract and above reproach where possible." And this advice, according to the testimony, was "[s]imilar to advice that [they] gave [Renno], which [was] don't solicit customers, don't solicit employees, don't take anything private or confidential."

BB&T also attempts to support this claim by asserting that "Snellings Walters drafted Renno's solicitation email to send to BB&T customers regarding his resignation." But pretermitting whether Renno's departure email can even be considered a solicitation, BB&T has not provided a citation to the record that supports the contention that Snellings Walters drafted the email, and we have been unable to locate any such evidence in the record. It is, of course, BB&T's burden as

the appellant to support its arguments with citations to the record,[42] and it is *not* this Court's job to cull the record on BB&T's behalf.[43]

Finally, BB&T contends that "Snellings Walters and Renno actively worked together to recruit Davis and O'Pry." And in support of this claim, they point to O'Pry's breakfast meeting with Renno and Davis on the morning of their resignations and the fact that she was thereafter contacted by a principal at Snellings Walters. They also cite text messages Renno exchanged with two Snellings Walters principals

---

[42] *See Wilbanks v. State*, 251 Ga. App. 248, 268 (19) (b) (554 SE2d 248) (2001) ("It is a sound rule of appellate practice that the burden is always on the appellant in asserting error to show it affirmatively by the record." (punctuation omitted)); CT. APP. R. 25 (a) (1) (providing that appellant's brief "shall contain a succinct and accurate statement of the proceedings below and the material facts relevant to the appeal; a citation of the parts of the record or transcript essential to a consideration of the errors; and a statement of the method by which each enumeration of error was preserved for consideration"); CT. APP. R. 25 (c) (2) (i) ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of a specific reference, the Court will not search for and may not consider that enumeration.").

[43] *See Luong v. Tran*, 280 Ga. App. 15, 16 (1) (633 SE2d 797) (2006) ("Our requirements as to the form of appellate briefs were created, not to provide an obstacle, but to aid parties in presenting their arguments in a manner most likely to be fully and efficiently comprehended by this Court. With respect to our requirement that briefs contain appropriate citation to the record, we note that it is not our job to cull the record on behalf of a party." (footnotes omitted)).

prior to his resignation that suggest he was trying to persuade Davis to resign with him and also take a job at Snellings Walters.

But to the extent BB&T relies upon Renno's actions to build its case against Snellings Walters, the restrictive covenants in Renno's contract are unenforceable. And as for Snellings Walters's communications with or about Davis and O'Pry, there is nothing in the record suggesting that the company used "predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions"[44] in its recruitment of those former BB&T employees.

To the contrary, Davis testified he was unhappy in his employment with BB&T due to his disagreement with its decision to out-source jobs to another country, which he believed was impacting the end work product from the company. He further testified that he was already communicating with Snellings Walters on his own prior to learning that Renno was leaving to work there.

For her part, O'Pry testified that the first person to speak with her about leaving BB&T to work for Snellings Walters was a principal with Snellings Walters, not Renno, but that it happened right after Renno resigned. And in her communications

---

[44] *See supra* note 40 & accompanying text.

with Snellings Walters, she learned they could offer her opportunities BB&T could not. More specifically, BB&T denied her request to telecommute, and she had reached the top of her pay scale with no room for advancement.

In sum, BB&T offers no evidence that Snellings Walters used improper means or wrongful conduct with an intent to maliciously injure BB&T when it communicated with Davis and O'Pry about future employment opportunities.[45] And,

[45] *See Contractors' Bldg. Supply, Inc.*, 199 Ga. App. at 40 (2) (holding that trial court erred in denying summary judgment on question of tortious interference claim when "[former employees] explained that they had been dissatisfied with [the company's] management and compensation policies, and the pattern of contacts between the three men and [the new employer] does not suggest the existence of a plan or scheme designed to impair [the company's] financial position or induce breaches of employment contracts"); *Am. Bldgs. Co.*, 260 Ga. at 349 ("Although there is evidence in this case that defendants did attract away key personnel within [the company's] engineering and drafting departments, the evidence further shows that these employees left [the company's] employ because of pre-existing dissatisfaction with their job positions there."). *Cf. Carroll Anesthesia Assocs., P.C. v. AnestheCare, Inc.*, 234 Ga. App. 646, 649 (1) (507 SE2d 829) (1998) (explaining that "[the privilege of fair competition] is not applicable where a competitor destroys or inflicts substantial injury by means of attracting away all or a large percentage of personnel upon whom the employer must depend to function, especially if other circumstances are present" in case in which testimony established that competitor "made a concerted effort to deprive [appellant] of all its employees so that [appellant] would have nobody left to do the work").

once again, the trial court did not err in granting summary judgment in favor of Snellings Walters on this issue.

For all these reasons, we affirm the trial court's grant of summary judgment in favor of Renno and Snellings Walters.

*Judgment affirmed. Mercier and Pinson, JJ., concur.*